## 𝔎𝔦𝔠𝔥𝔪𝔬𝔫𝔡.     ·

### HALSEY v. PETERS' EXECUTOR AND ALS.

#### May 1, 1884.

1. EQUITABLE JURISDICTION AND RELIEF—*Parol Gifts of Land—Specific Performance.*—Equity will compel conveyance of legal title of land claimed under parol gift, supported by meritorious consideration, and by reason of which donee has been induced to alter his condition and make expenditures of money in valuable improvements on the land (*Burkholder* v. *Ludlam*, 30 Gratt. 255), and will protect such gifts equally with parol agreements to sell land.

2. IDEM.—*Equitable Title.*—No writing is necessary to create a good equitable title to real estate.

3. IDEM—*Statute of Frauds.*—Statute of frauds has no bearing on parol gifts of land, which are founded on meritorious considerations. If the promise, reduced to writing, could, under the circumstances, be enforced, it may be enforced even when only parol.

Appeal from decree of circuit court of Campbell county, entered 28th February, 1882, in the suit in chancery wherein Edwin S. Halsey was plaintiff and William E. Peters, in his own right and as executor of Don T. C. Peters, deceased, was principal defendant.

The object of this suit, instituted in 1880, was to compel specific performance of a parol gift of land and personalty by appellee's testator in 1876, which was accompanied by delivery of possession, and followed by change of circumstances on part of donee, who gave up his business to accept the gift, and afterwards expended money in erecting permanent improvements on the land. According to the bill, plaintiff, in 1876, was living in

Lynchburg, and engaged in a tobacco business that was profitable, with flattering prospects. Testator was then living, was his uncle, in affluent circumstances and without wife or child. He had been relieved from insolvency and come into a large fortune by the will of a wealthy friend, Patrick Matthews. Testator manifested towards plaintiff affectionate feelings, and on many occasions declared his intention to provide for him liberally, and more than once said that of all his relations, he was the only one who had exhibited towards him the feelings of a relative and befriended him in time of need.

Plaintiff's means in recent years were not ample, but the contrary. He was in debt, his resources were limited, and he often contemplated various plans for bettering his condition. Finally he entered into business with his brother under substantial, pleasing and satisfactory inducements. From 1861 to 1874, plaintiff resided in the city of New York, and previously in Missouri, where he engaged in the tobacco business. He was then in easy circumstances, possessed considerable money, and had frequently rendered valuable services to his uncle, assisting him in business and allowing him the use of large amounts of money without interest; even supplying him from time to time funds to pay board bills and to meet pressing wants for personal support, which he then greatly needed. For five years these acts were continued, and as they were inspired by natural affection and personal good will, he kept no accurate account of them. These kindnesses were frequently recognized by the recipient with the warmest expressions of gratitude and regard. In 1864–5, his uncle went to Central America, plaintiff furnishing the means. While there he became almost penniless, and plaintiff, apprised of his distress in a foreign country, sent him money to relieve his necessities and to return home. For these acts his uncle was fluent in expressing gratitude. From one time to another his uncle received of him seven or eight thousand dollars, none of which, except some fifty or sixty dollars, was ever repaid. Besides, plaintiff lent him $4,000, which

he kept for years and returned without charge of interest. In 1865, testator returned to Virginia financially utterly prostrated. For several years he was supported by the liberality of his friend, Patrick Matthews, by whose advice he took the benefit of the bankrupt act and was discharged. When Patrick Matthews died, by his will he left testator a handsome fortune, which he received and enjoyed. A part of this legacy was a farm on Otter river, in Campbell county, containing about twenty-two hundred acres, possessing ordinary improvements, and fairly stocked with horses, cattle and farming implements. In 1876, his uncle invited plaintiff to accompany him on a visit to that farm, and he did so. Whilst there the former communicated to the latter his intention to give him that entire estate with the personalty on it, in consideration of past services and gratitude and affection. Plaintiff reminded his uncle that he was then in debt, and that if he gave him the estate his creditors would subject it, and moreover, that he had recently entered into business with his brother under flattering prospects, and would be unwilling to abandon it for any temporary occupation or advantage, and would not do so without substantial and permanent inducements. His uncle then said he would make better provision for him than that business promised, asked about the extent of his indebtedness, and said he would settle his debts, and afterwards advised him to take the benefit of the bankrupt act. His uncle then promised that if plaintiff would relieve himself of his debts by bankruptcy and give up his Lynchburg business, he would put him in possession of the Otter river estate with all the personalty on it, help him with his means to improve and cultivate it; that he should have it as his future home, and that when discharged of his debts by bankruptcy he would make him a good title to it absolutely. He then said: "I went into bankruptcy upon Mr. Matthews advice. Whenever he told me to do anything I did it, and you know the result. Now you follow my advice and go into bankruptcy, and you shall have the place and all the products to live upon; you can sell and

use the proceeds of any of the stock, you don't need to culti-
vate it, and you can keep it and hold it as your own, make it
your home, and when discharged in bankruptcy you shall have
the title." He also said that the plaintiff had helped him in
time of need; had shown him more consideration than any of
his relatives, and that he intended to do still more for him.
The plaintiff was loath to leave Lynchburg, where his mother
and brother resided, and to give up his business there, but did
so in consideration of these inducements and promises. The
uncle proceeded to carry out his promises, employed a lawyer to
institute proceedings and get the nephew relieved of his debts.
Plaintiff, though much impeded by his creditors, did get this
discharge in 1880. In 1876 he assumed possession and control
of, added to the stock, built a great deal of fencing, hired an over-
seer, and paid him to assist in cultivating the land, sold such
stock as he desired, spent his own money and that derived
from the place to improve it and make it suitable as his home,
moved upon the place, abandoned his business in Lychburg,
all solely by reason of these inducements. Pending the bank-
rupt proceedings he signed his name as "manager." His uncle
advised him to this course until he could get his discharge.
His health becoming impaired in 1879, he came to his mother
in Lynchburg, but continued to possess and manage the farm
through his overseer, and to sell the produce as before, and his
uncle never interfered. Before he received his discharge, his
uncle died in June, 1880. His uncle had no intention to defraud
him, and would have conveyed to him the estate had the dis-
charge been obtained before his death, and would still do so if
alive. In 1880 testator's will was produced, dated 1870, but
with a codicil dated 1877, only in reference to lands in other
states, whereby the bulk of his estate was given to the appellee,
who was named, and qualified as executor, giving bond in
penalty of $129,000.

The Otter river estate is not mentioned in the will. Testator's
health for the last years of his life was feeble, he being afflicted

with a mortal disease, and at times unable to transact or to be annoyed with business, and he died without having executed any paper assuring to plaintiff the rights which had vested in him under his promises, or his performances toward their consummation. Since then the executor has declined to interview him as to his rights, but ignoring them, endeavored to take forcible possession of the property.

The defendant answered, denying that plaintiff had acquired any property rights in the Otter river farm or the personalty thereon, alleging that the agreements between testator and him affected only the use of the same, and claiming under the will both realty and personalty.

The depositions of many witnesses on both sides were taken.

At the hearing the circuit court was of opinion that the intention of Don T. C. Peters was to give the said farm and the personalty on it to his nephew, Edwin S. Halsey, and that he did verbally give it to him ; but that he died without having perfected the gift of the land by deed or writing so as to pass the title to him, and that there is not sufficient proof of the alleged agreement in relation to plaintiff's abandoning his connections with his brother in the tobacco business, in consideration for the gift of the land, to authorize a court of equity to decree specific performance thereof. But as to the personalty on the land, the gift was consummated by the delivery thereof, with the absolute right to dispose of the same. And the circuit court perpetuated the injunction which had been awarded plaintiff to restrain the interference of the executor as to the personalty, but dissolved it as to the land, and ordered plaintiff to surrender the latter to the executor, subject to plaintiff's right to remove the personalty, and decreed an account of rents since 1880. From this decree the said Edwin S. Halsey appealed to this court.

*John W. Daniel* and *W. R. Staples,* for the appellant.

*Kean & Kean* and *Kirkpatrick & Blackford,* for the appellee.

LACY, J., after stating the case, delivered the opinion of the court :

It has been seen that the circuit court, by its decree, confirmed the appellant's title to the personalty given him by his uncle, and that as to the realty, although satisfied of the fact of the gift, it felt itself constrained to refuse specific execution of title, because in its judgment the plaintiff's case was defective in being without a conveyance of the legal title or written contract to convey ; that he could not compel a conveyance without show-ing a consideration passing between Don T. C. Peters and him-self, and that the proof of such consideration was insufficient.

The question involved in this cause has been the frequent subject of judicial investigation and decision in this court and in the highest courts elsewhere.

A court of equity will compel the conveyance of the legal title of land claimed under a parol gift, supported by a meritorious consideration, and by reason of which the donee has been in-duced to alter his condition and make expenditures of money in valuable improvements upon the land; and equity will protect a parol gift of land equally with a parol agreement to sell it, if accompanied by possession, and the donee induced by the promise to give it has made valuable improvements on the property. No writing is necessary to create a good equitable title to real estate. If the contract, when in writing, would be enforced as founded upon a valuable consideration, it would in like manner be deemed a valuable consideration when the contract was by parol.

In the case of *Neale* v. *Neales* (9 Wall. 1), in the supreme court of the United State, Mr. Justice Davis delivering the unanimous opinion of the court, said : " The statute of frauds requires a con-tract concerning real estate to be in writing, but courts of equity, whether wisely or not it is too late now to inquire, have stepped in and relaxed the rigidity of this rule, and hold that a part per-formance removes the bar of the statute, on the ground that it

is a fraud for the vendor to insist on the absence of a written instrument when he had permitted the contract to be partly executed. And equity protects a parol gift of land, equally with a parol agreement to sell it, if accompanied by possession, and the donee, induced by the promise to give it, has made valuable improvements on the property. And this is particularly true where the donor stipulates that the expenditure shall be made, and by doing this makes it the consideration or the condition of the gift."

First Leading Cases in Equity, American note to *Lester* v. *Foxcroft*, 768 (marg).

In that case, the father who had given the land to the wife of the son, who had built upon it with her money, disavowed the gift, and upon opportunity seized the possession and moved into the house; but he was compelled to specifically perform the agreement to give, the court holding that damages would not compensate for the breach of this contract, nor answer the intention of the parties to it, and that a specific performance was essential to the ends of justice.

In the case of *Burkholder* v. *Ludlam,* 30 Gratt. 255, which was a suit by judgment creditors of the donor, Judge Burks, delivering the opinion of this court, said : " The lot claimed by the appellants is not subject to the lien of the judgments of the appellees, Ludlam and others, if when these judgments were recovered against William Crumpton the appellants, or either of them, had a valid equitable title to said lot;" and cited as establishing this proposition *Floyd, trustee,* v. *Harding and others,* 28 Gratt. 401; *Hicks* v. *Riddick and others,* 28 Gratt. 418; *Borst* v. *Nalle,* Id. 423; *Shipe, Cloud & Co.* v. *Repass,* Id. 716.

He says further : " The claim of the appellants to the lot in question, at the date of the judgments, was under a parol agreement, and if it were a contract of sale, to take the case out of the operation of the statute of fraud and perjuries, and entitle the appellants to specific execution on the ground of

part performance, it is well settled that the agreement and acts of part performance must be clearly proved, and it must appear that the agreement is certain and definite in its terms, that the acts proved in part performance refer to, result from, or were done in pursuance of the agreement proved, and that the agreement has been so far executed that a refusal of full execution would operate a fraud upon the party seeking execution and place him in a situation which does not lie in compensation. *Wright* v. *Pucket*, 22 Gratt. 370."

In the case at bar, it must be borne in mind, as has been stated, that the agreement sought to be enforced here is *a parol agreement to give the land* in question. It has been held in many reported cases, that a court of equity will compel the conveyance of the legal title to the land claimed under a parol gift, supported by a meritorious consideration, and by reason of which the donee has been induced to alter his condition and make large expenditures of money in valuable permanent improvements on the land, and that the donee under such circumstances becomes the equitable owner of the land, and may demand the legal title.

In the case of *Syler* v. *Eckhart*, 1 Binney, 378, Tilghman C. J., said : " It has been settled that where a parol agreement is clearly proved, in consequence of which one of the parties has taken possession and made valuable improvements, such agreement shall be carried into effect. We see no material difference between a sale and a gift; because it certainly would be fraudulent conduct in a parent to make a gift which he knew to be void, and thus entice his child into a great expenditure of money and labor, of which he meant to reap the benefit himself." See also *Eckert, &c.*, v. *Eckert*, 3 Penn. R. 332 ; *Eckert* v. *Mace and others*, Id. 364; *Stewart* v. *Stewart*, 3 Watts R. 253 ; *France* v. *France*, 4 Halstead Ch. R. 650 ; *Lobdell* v. *Lobdell*, 36 New York R. 327 ; *Bright* v. *Bright*, 41 Ill. R. 97 ; *Law* v. *Henry*, 39 Ind. R. 414 ; *Young* v. *Glendenning*, 6 Watts R. 509 ; *Mahon* v. *Baker*, 2 Casey R. 519 ; *Atkinson* v. *Jackson*, 8 Ind. R. 31 ;

*Freeman* v. *Freeman*, 43 N. Y. R. 34 ; *Peters* v. *Jones*, 35 Iowa R. 512 ; *Rerick* v. *Kern*, 14 Ser. & Rawle R. 267 ; *Shephard* v. *Bivin and others*, 9 Gill R. 32 ; *Shobe's Ex'or* v. *Carr*, &c., 3 Munf. 10.

It will be remembered that this is not a controversy in fact between the donor respecting his contract and the donee who had accepted the gift, nor is it a controversy between the donee and the creditors of the donor, nor between his subsequent vendees. for value without notice, and the donee. No creditor of the donor nor purchaser from him is claiming to subject the property in question. Any equity which would prevail against the donor must also prevail against his devisee. In *Goring* v. *Nash*, 3 Atkyns R. 186, Lord Hardwicke is reported as saying : " The strict measure which governs the courts in a question between persons who come to carry specific articles into execution, and purchasers, is not the rule of this court, for between families, the court have considered whether it would be attended with hardships or not, or whether a superior or inferior equity arises on the part of a person who comes for a specific performance." And this is the ground Lord Cowper went upon in the case of *Finch* v. *Lord Winchilsea*, 1 P. Wms. 277. See *Triplett* v. *Romine*, 33 Gratt. 657 ; 2 Min. Inst. (3d Ed.) 684.

But in this case, as we have seen, we have not only the ties of consanguinity and the gratitude for large benefits in time of need, but we have the valuable consideration which would maintain the agreement against the claims and demands of creditors, as we have seen above.

In the case of *Freeman* v. *Freeman*, 43 N. Y. 34, Grover, J., said: "It is insisted that an executory promise, not founded upon any valuable consideration, is a mere nude pact, furnishing no grounds for an action at law, and that performance of such a promise will not be enforced in equity. This is true so long as the promise has no consideration. Anything that may be detrimental to the promisee or beneficial to the promisor in legal estimation will constitute a good consideration for a promise.

Expenditures made upon permanent improvements upon land with the knowledge of the owner, induced by his promise made to the party making the expenditure, to give the lands to such party, constitute in equity a consideration for the promise. (Citing *Lobdell* v. *Lobdell,* 33 How. 347 ; *Crosbie* v. *McDaul,* 13 Vesey, 147 ; *Shephard* v. *Bivin,* 9 Gill, 32 ; Parsons on Contracts, 3 Vol., p. 359.) The statute of frauds has no bearing on the case. If the promise reduced to writing could, under the circumstances, be enforced in equity, it may be, although by parol."

It is against conscience to suffer a party who had entered and expended money in the faith of a parol agreement to be treated as a trespasser, and for the other party, in fraud of his engagement, though that was verbal, to enjoy the advantage of the money laid out. Courts interfere in such cases not on the ground of a breach of the verbal agreement, but because of the acts done under it on the faith of its terms, and which it would be bad faith in the vendor not to carry out by executing its terms, and a court of equity will always enforce a promise upon which reliance is placed, and which induces the expenditure of labor and money in the improvement of land. Such a promise rests upon valuable consideration. The promisee acts upon the faith of the promise. And we can perceive no important distinction between such a promise and a sale. Permitting the promisor to avoid performance, operates as a fraud as much in the case of a gift as in the case of a sale, so far as expenditures upon improvements are concerned, where possession has been taken and valuable improvements made upon the faith of the promise. These acts constitute part performance by the donee, and the agreement will be specifically enforced by a court of equity.

The evidence in this cause shows, as was held by the circuit court, that Don T. C. Peters gave the property in question to the appellant, both the land and the personalty ; that he put him in possession of this gift, and that the appellant took charge of the same as his own property, and has maintained such control ever

since, exercising, with the approval of the donor, every act of ownership of which it was capable, cultivating in part and renting it out in part, and collecting rents for the same. That the appellant, at the instance and request of his said uncle, gave up his business, by which he made his living, to accept the property given to him; that the appellant put upon the place expensive improvements of a permanent character, for which he paid, with the approval of his uncle, and, indeed, conducted the place upon his own account; that at the request and upon the advice of his uncle he went into bankruptcy, and his uncle promised to give him a deed for the place as soon as his discharge was obtained; and that his uncle was under great pecuniary obligation to him in his time of extreme need and distressing want and helplessness, and that his uncle felt deeply grateful for his past kindness. So far as his uncle was concerned the gift was consummated in all possible respects except the actual conveyance of the title, which was delayed until the discharge in bankruptcy had been obtained, which was not obtained until a few months after the death of his uncle. That it was the purpose of Don T. C. Peters to perfect this gift in all respects cannot be fairly doubted from this record and the facts there disclosed. The efforts to sell the place are claimed, and doubtless correctly, to have been made in order to change the investment for the benefit of the appellant after his health became so impaired that he could not live on the place. That the uncle intended, under the circumstances, to deprive his nephew of the benefits of this gift at a time when he was in the greatest need and more than ever dependent, cannot be justly inferred under all the circumstances of the case. His gratitude and affection had led him to the gift in the first instance, and he never ceased his kind offices to this nephew. And when his nephew was away from home in a distant state sick, he, doubtless, remembered the past and the dark hours of his own life, and sent money to his nephew to relieve his wants and necessities, and down to the last hours of his life, when stretched upon his dying bed, we find him repeating the decla-

rations of the gift to his nephew. His failure to make the deed was due, and should fairly be imputed, to circumstances rather than to intention. He did nothing in his will to contradict this conclusion. The will was made many years before the transactions with his nephew, and there is no mention of this property, large and valuable as it is, to be found in the will; but it is claimed by the brother under the residuary clause of the will. Under the authorities we have cited, when we come to apply the principles therein to the proved facts in this case, we can reach but one satisfactory conclusion. To permit the brother, who is otherwise amply provided for, to deprive the nephew of this gift upon the ground that no deed or other writing was actually made, would be to enable him to perpetrate a fraud upon the appellant through the acts of the testator, under whom he claims. The appellant, in good health and hopes, was moving along his course in a good-paying business; he had all the possibilities of life before him; he was, at least, independent. Urged on by feelings of gratitude, constrained by ties of blood, inspired by personal regard, indeed love and affection, the uncle induced his sister's child, his own benefactor, his favorite nephew, to take toward him, a childless uncle, the position of a son, and he assumed the place of a father; induced him to abandon his own means of support and depend upon him, gave him this handsome property; induced him to spend his own money upon its improvement, and treat it and look upon it as his own, and doubtless contemplated his work with satisfaction. Should not this agreement be now enforced?

The brother says it was never the intention of the uncle *to give*. The answer is, that the evidence in this cause incontestably proves that he *did give*, and the judge of the circuit court so held. But yet, urges the brother, he gave only the usufruct, the use for life, to the nephew. The answer to that is, that while the evidence clearly and distinctly proves the absolute gift of the property, there is nothing in the record which sustains this assumption of a gift for life. Such a gift has no

existence; it was a gift of the property by this grateful and loving uncle.

The record furnishes no basis to impute fraud to the donor, but the contrary ; the utmost beneficence on the part of the uncle.

The circumstances of the donee have now greatly changed ; the years of his youth are gone; sickness and helplessness have come upon him; the business in which he was engaged has gone on and prospered, but he has no share in its proceeds; his means of living, surrendered by his uncle's inducement, are now no more ; he cannot be placed as he was, and compensation cannot be made in damages; the work cannot be effaced; he cannot live over the years that are passed; he must have this gift as the result of the agreement, or he cannot be compensated; his money, as well as his time, has been spent under it, and the agreement between him and his uncle should be specifically enforced as against the appellees.

The circuit court erred in holding that there was no sufficient proof that valuable business had been given up, and that a court of equity could not enforce the agreement; and the decree of the said court must be. reversed and annulled, in so far as it is in conflict with the foregoing views.

FAUNTLEROY, J., dissented.

DECREE REVERSED.