# 𝔕𝔦𝔠𝔥𝔪𝔬𝔫𝔡.

## GRUBB BROTHERS V. MOORE, CLEMENS & COMPANY.

### March 12, 1908.

1. SPECIFIC PERFORMANCE—*How and When Enforced—Effect of Complainant's Default—Case in Judgment.*—Specific performance of a contract may frequently be enforced either by a direct decree to that effect, or by an injunction restraining a party from doing what he has agreed not to do; but whether sought in one way or the other, a court of equity will not, as a general rule, specifically enforce a contract at the suit of a party who is himself in default in respect thereto, or has himself violated its terms and obligations. The remedy does not exist as a matter of right, but rests in the sound discretion of the court upon all the circumstances of the case; and when the party seeking performance is himself in default, it depends in a great measure upon how far the default goes to the essence of the contract whether he can have performance or not. In the case in judgment the complainants refused to perform their part of the contract in a matter which went to the essence of the contract. They purchased of defendants an insurance agency business, and, as a consideration therefor, agreed to pay them a *per cent.* of the first renewal premiums, which renewals they promised to use reasonable diligence to secure. After the purchase, they were unwilling to incur the usual and customary labor and expense incident to the renewal of policies of insurance, and they refused to pay the usual commissions to sub-agents formerly employed by defendants to solicit insurance, with the result of a transfer of such renewals to other companies, and the loss to the defendants of the stipulated compensation. Under such circumstances the complainants are not entitled to specific performance.

Appeal from a decree of the Circuit Court of Loudoun county. Decree for complainants. Defendants appeal.

*Reversed.*

The record shows that the appellants, Grubb Brothers, who had been for a number of years conducting the business of an

insurance agency, entered into the following agreement with the appellees, Moore, Clemens & Company:

"This memorandum, made this 31st day of March, 1906, between H. J. and J. H. Grubb, partners under the firm name of Grubb Bros., of the first part, and Samuel L. Moore, John R. Clemens, W. S. Jenkins and C. H. Shipman, partners under the firm name of Moore, Clemens & Co., of the second part, Witnesseth: That in consideration of the undertakings hereinafter set forth, the said parties of the first part do bargain and sell, transfer and assign unto them of the second part all the rights and interests of them of the first part in and to all fire, accident, health and bonding insurance policies now in force which have been issued through the agency of the said Grubb Bros. by the line of insurance companies which they now represent or have represented; and also all expirations on policies now owned by them or under their control; the said interest now transferred being the right and privilege of having the said policies renewed and of receiving a certain proportion of the premiums of such renewals; and also all books and records pertaining to said business, and also the following office furniture and fixtures in the office of the said Grubb Bros. in Leesburg, Va., to-wit: One iron safe, one Century typewriter and stand therefor, one copying press and stand and fixtures belonging thereto, three cabinets, one flat top desk, one cloth top and one oak table, one high desk and one coat rack, one coal stove and belongings, four chairs and one stool.

"In consideration for which the said parties of the second part bind themselves to pay to them of the first part fifteen *per centum* of the premiums on the first renewals of all such policies, which may become payable and collectible; from which, however, shall be deducted Grubb Bros. proper share of all necessary cancellations.

"It is further agreed that the said parties of the second part shall advance at once to Grubb Brothers the sum of fifteen hundred dollars, which is to bear interest from date at six *per cent.*

and is to be refunded by them as follows, viz.: at the end of each month their share (15 *per cent.*) of all premiums on any of said renewals which have become payable to said Moore, Clemens & Co. during the month shall be credited upon said fifteen· hundred dollars until the same shall be taken up and fully repaid; but if the said share of Grubb Brothers (15 *per cent.*) in such renewals shall not amount to said sum of fifteen hundred dollars and interest, they promise to bind themselves to pay the balance to parties of the second part in money.

"And also in consideration of the premises said parties of the first part transfer and assign to the parties of the second part their good will in said business in the following territory, and promise said parties of the second part that they will not engage in the insurance business (except life insurance) as agents or managers, except with the written consent of the parties of the second part in said territory, to-wit: The counties of Loudoun, Fairfax, Alexandria, Prince William, Fauquier, Page, Shenandoah, Clarke, Warren and Frederick, in Virginia, and Montgomery and Frederick, in Maryland.

"All parties hereto mutually promise and undertake to use reasonable diligence as they may have opportunity, to secure the renewals mentioned above. Grubb Bros. shall have reasonable access to and the privilege of examining all the books involved in this transaction and business which may be necessary to ascertain that the provisions of this contract are fully carried out."

Grubb Brothers, in accordance with the agreement, turned over their business, together with the books and records pertaining to the same, and the office furniture and fixtures, except the typewriter and some other articles of little value, in the bill and proceedings mentioned. In a little over one month after the parties entered into the said agreement, the following correspondence took place between them as to their rights and duties under the contract:

"May 2, 1906.

"Messrs. Grubb Bros.,
        "Leesburg, Va.

"Gentlemen:

"Mr. R. M. Kivett has this day returned to us his report of insurance and renewals taken. In his report he charges us and retains ten *per cent.* of the premiums amounting to (4.63) on the renewals of the two policies of Buckley Bros. amounting to $42.55 and one policy of Mrs. Lilian King, amounting to ($3.75).

"If you control this renewal independent of Mr. Kivett then he has no right to retain this commission but the same is to be credited to you under your contract with us of March 31, 1906. If, however, Mr. Kivett is acting for you in this matter, we shall charge you with the ten *per cent.* retained by him and credit you with five *per cent.* in accordance with the provision of your said assignment to us, or if he is not acting for you then the renewal has no connection with our said deal and you are entitled to no credits growing out of the transaction.

"Please advise us at once what are the true relations between you and Mr. R. M. Kivett in this matter, so that we may know how to enter it on your account, if at all.

                "Yours very truly,

                        "MOORE, CLEMENS & CO."

———

"May 3, 1906.

"Messrs. Moore, Clemens & Co.,
        "Leesburg, Va.

"Gentlemen:

"We are in receipt of your registered letter under date of May 2, in which you advise us that Mr. R. M. Kivett has returned to you his report of insurance and renewals taken in which he retains ten *per cent.* of the premiums amounting to

$4.63 on the renewals of the two policies of Buckley Bros. amounting to $42.55 and one policy of Mrs. Lilian L. King amounting to $3.75.

"As you have all the records of our insurance business you can very easily tell, and we are sure you do know, whether these policies are a part of the insurance issued through the agency of Grubb Bros. If they are renewals of policies issued through this agency, and we take it they are, otherwise you would not have written us on the subject, then by our contract with you we are entitled to fifteen *per cent.* of the premium to be credited to our account and it matters not whether they are renewed through Mr. Kivett or any one else.

"Whatever might have been the relation between Mr. Kivett and our agency up until the date of the transfer to you the same terminated by the very terms of our contract with you, and what our contract prohibits us from doing directly we shall not undertake to accomplish indirectly.

"We will thank you to advise us that you have given us credit for the fifteen *per cent.* of the premiums on all policies renewed during the month of April.

"Very truly yours,

"GRUBB BROS."

"May 3, 1906.

"Messrs. Grubb Bros.,
        "Leesburg, Va.
"Gentlemen:

"We have yours of this date, in which you state that your relations with Mr. Kivett terminated with your assignment to us. If that be true, then we cannot see that you have con-trolled in any way the renewals referred to, or are entitled to any *per cent.* of the renewal premium. Indeed, Mr. Kivett took the position that *he* controlled this renewal and would send the insurance to another company unless he received the ten *per cent.* of the premium.

"So, under the interpretation of the situation this is a deal between Mr Kivett and ourselves, and we will have to decline to credit your account with any amount growing out of this transaction.

"This, of course, will be our action in similar cases which may arise.      . "Yours very truly,

"MOORE, CLEMENS & CO."

"May 4, 1906.

"Messrs. Moore, Clemens & Co.,
        "Leesburg, Va.
"Gentlemen:

"In reply to your letter of May 3, we have to say that we are more than surprised at the position taken by you in refusing to credit us with fifteen *per cent.* of the premiums of the policies issued through our agency and which you are renewing.

"You must know that we cannot and will not submit to this violation of your contract. It matters not what kind of an arrangement you may enter into with Mr. Kivett or anybody else, if you issue renewals of policies issued through our agency, we get our fifteen *per cent.* on such renewals.

"Therefore, one of three courses must be pursued. If you refuse to credit our account with this fifteen *per cent.* we understand that you intentionally violate the plain terms of your contract, and therefore we call upon you to return our business, our property, and in other words restore the former condition after providing to us such compensation for our loss as we have sustained by entering into an agreement with you which you have broken.

"Should you decline to accept either of these suggestions we plainly tell you that we shall be compelled to take such course as in our judgment will save us from being still further damaged.            "Yours very truly,

"GRUBB BROS."

"May 8, 1906.

"Messrs. Moore, Clemens & Co.,
           "Leesburg, Va.

"Gentlemen:

"Not having received a reply from you to our letter of the 4th inst., we will thank you to advise us at once what course you intend to pursue in regard to the matters referred to in that letter.

                    "Yours very truly,
                              "GRUBB BROS."

                                                  "May 10, 1906.

"Messrs. Grubb Bros.,
           "Leesburg, Va.

"Gentlemen:

"Replying to your favor of the 8th inst., will say that we expect to live up to the contract and will expect you to do the same, we will be over to get our other furniture and fixtures at an early date.

                    "Yours very truly,
                              "MOORE, CLEMENS & CO."

                                   "Leesburg, Va., May 23, 1906.

"Messrs. Moore, Clemens & Co.,
           "Leesburg, Va.

"Gentlemen:

"On March 31 we entered into an agreement with you by which we transferred to you our interest in the insurance business heretofore conducted by us.

"In consideration of this transfer you promised and agreed to pay us fifteen *per cent.* of the premiums on the first renewals of all policies then in force which had been issued through our agency.

"From the nature of this transaction you knew that this was ·intended to put us out of the fire insurance business and you were entering upon the same: You desired to get hold of this business which meant quite a considerable income each year. From the character of the deal the utmost good faith was required to carry out this contract. And relying upon the fact that we knew it was greatly to your pecuniary interest to carry out fairly this contract, doing fairly by this business, treating it in the same manner as you would other business written through your own agency, and knowing that if you would do this our interests were safe and we would receive a fair compensation for the business which represents at least ten years of continuous hard work, we did agree to trust the same to you. ·

"That we are greatly interested in the renewal of these policies is patent as our compensation is fixed at 15 *per cent.* of the premiums of these renewals and we believe that you would be interested in securing these renewals in order that you might build up a large and profitable business for your agency. We have been advised by your firm, however, that inasmuch as you have agreed to pay us fifteen *per cent.* of the first renewal premiums you will not incur any expense, even though it be such as a commission to a solicitor or reasonable expense in other instances, to secure the renewals of any of this business written by us. And we are further advised that you will incur reasonable expenses of exactly similar kind in the management of the business written by your *our* agency and in securing new business, and we are told that we must secure these renewals otherwise you will produce such a condition of affairs as will bring about the necessary cancellation of a considerable number of these policies, thus defeating our right to the fifteen *per cent.* according to your contention. When this matter was brought to our attention in your letter of May 2, we wrote under date of May 3, telling you that we were entitled to credit of 15 *per cent.,* in accordance with our contract, of all policies renewed.

"We understood, and so did you, that we were retiring from

the business and you were to conduct it, bearing the expense of same. By your letter of May 3 you advised us that you de-- clined to credit our account with any amount on policies you renewed through solicitors, even though these policies renewed are renewals of policies issued through our agency, if the solicitor requires a commission such as is customary to be paid, and such as you say will pay on your *our* own line of business.

"When we discovered your intention in this respect we then sent you our letter of May 4, to which you have never yet replied.

"On May 8, we called upon you again specifically to reply to our letter of May 4, and in return received your letter of May 10 in which you purposely deal in generalities and adroitly evade any reference to our letter of May 4.

"From your conduct in this matter we see plainly that, according to a fair and reasonable construction of the contract, you do not intend to comply with its spirit and when these solicitors have to make other arrangements to place their insurance you will have lost the hold on the business and we will have lost our fifteen *per cent.*

"We decline to submit to this kind of treatment and we simply desire to advise you how we feel in respect to it and we shall promptly take steps to prevent a sacrifice and further loss to ourselves by having entered into an agreement with you which you have broken.

"Very respectfully,

"GRUBB BROS."

Moore, Clemens & Co. made no reply to the letter of Grubb Bros. of May 23, 1906, and some time afterwards Grubb Bros. engaged in the fire insurance business on their own account, contrary to the provisions of the agreement with Moore, Clemens & Co. In July following, Moore Clemens & Co. filed their bill against Grubb Bros., in which they set out the agreement and the correspondence between the parties; their construction of

the contract, which they allege they afterwards receded from. They further alleged that Grubb Bros. had violated the agreement in re-entering the business of fire insurance agents; in refusing to surrender certain personal property named; and in collecting and retaining certain premiums to which they were not entitled; that they were insolvent, as shown by certain papers exhibited; and that if permitted to continue in the business of fire insurance agents in violation of their agreement the loss of the complainants would be irreparable. The prayer of the bill was, that Grubb Bros. "be enjoined and restrained from soliciting fire insurance for other companies than those represented by your orators, and from carrying on the business of fire insurance agents, except under their contract with your orators, within the territory designated above; and that they be required to specifically execute and perform said contract in good faith and with reasonable accuracy; and to deliver to your orators the furniture and fixtures and other articles sold them and not yet delivered; that an account may be taken of the premiums received by them" of a certain character, "and that they be charged with the same;" and for general relief.

An injunction as prayed for was granted upon the filing of the bill. Grubb Bros. demurred to and answered the bill. Among the grounds of demurrer assigned were the following, viz.: that the bill did not make out a case for the specific execution of the agreement between the parties, because there was no averment in it that the complainants had kept and performed the agreement on their part, or that they were ready and willing to do so, and because they had a complete and adequate remedy at law. In their answer, after giving their construction of the agreement and the correspondence between the parties, they, among other things, allege that the complainants did not by their letter of May 10 agree to give them credit for the fifteen *per cent.* of the premiums on the first renewals of the policies previously issued through the defendants' agencies, but

on the contrary in interviews between the parties between that date and the 23rd of that month they expressly refused to do so; that the complainants not only refused to credit them with said fifteen *per cent.* of the premiums but so conducted their business that much of the insurance which had been done in companies which the defendants represented was not renewed in any of those companies but was taken out in other companies, thus greatly damaging the business which the defendants had built up, and if that course of conduct was continued it would result in greatly reducing the amount they were entitled to and would have received under the agreement if it had been carried out in good faith on the part of the complainants; that in this condition of affairs the defendants wrote the letter of May 23, and receiving no reply thereto within a reasonable time, or at all, they did go into the fire insurance business again, in order to protect themselves from loss and damage which were resulting and would result from the violation of the agreement on the part of the complainants, which could not be adequately compensated in actions at law for damages, or in a court of equity for specific performance, since the policies taken out through the agency of the defendants ran through periods of from one to five years, and the nature of the agreement was such that unless the complainants were honestly disposed to carry it out they could not be compelled to do so. The answer denied generally the allegations of the bill, except as admitted or explained.

Upon the hearing of the cause, the court rendered a final decree perpetuating the injunction theretofore granted, restraining Grubb Brothers from engaging in or carrying on the business of fire insurance agents in the territory named in the agreement, and directing them to deliver the said typewriter and other chattels in their possession to the complainants upon demand. To that decree this appeal was granted.

*E. E. Garrett,* for the appellants.

*Alexander & Alexander,* for the appellees.

BUCHANAN, J. (after stating the case as above), delivered the opinion of the court.

The errors assigned and relied on are that the trial court erred in overruling the demurrer to the bill, and in perpetuating the injunction granted upon the proofs upon the final hearing.

In the view the court takes of the case, it is unnecessary to pass upon the questions raised by the demurrer, for, if it be conceded that the allegations of the bill, including the statements in the exhibits filed therewith and made a part thereof, state a case entitling the complainants to have the agreement specifically executed, or to have the defendants enjoined from violating the contract on their part, the proof does not sustain those allegations.

Specific performance of a contract may frequently be enforced, either by a direct decree to that effect or by an injunction restraining a party from doing what he has agreed not to do; but whether enforced in the one way or the other, the principles which govern a court of equity in the exercise of such jurisdiction are the same. 4 Pom. Eq. Jur., sec. 1431; 5 Id. sec. 271; 26 Am. & Eng. Enc. L. 15; 22 Cyc. 844-5.

The general rule is, that a court of equity will not specifically enforce a contract at the suit of a party who is himself in default in respect thereto, or has himself violated its terms and obligations. *Powell &c.* v. *Berry, &c.,* 91 Va. 568, 22 S. E. 362; *Cox* v. *Cox,* 26 Gratt. 305, 308-9; *Bowles* v. *Woodson,* 6 Gratt. 78; *Harvie* v. *Banks,* 1 Rand. 408; *Vail* v. *Nelson,* 4 Rand. 478; *Jones* v. *Roberts,* 1 Call 187, 200, 3 Am. Dec. 576; 26 Am. & Eng. Enc. L. (2nd ed.), p. 70; 22 Cyc. 852-3; 2 High on Injunctions (3rd ed.), sec. 1119; Fry on Spec. Perf. (2nd Am. ed.), sec. 608; 6 Pom. Eq. Jur., sec. 805.

The general rule and an exception to it are thus stated by Judge Staples in delivering the opinion of the court in *Cox* v. *Cox, supra:* "Every bill for the specific execution of a contract is an application to the sound discretion of the court. It is not a case requiring the interposition of the courts *ex debito justitiae,* but rests in their discretion, upon all the circumstances. He who seeks the exercise of this extraordinary jurisdiction must show a contract certain and definite in its terms; that he himself is in no default, but has performed his part of the agreement; or, in the language of the judges, that he is 'ready, desirous, prompt and eager' to do so  *  *  *  When the party seeking performance is himself in default, whether he can have it or not depends in a great measure upon how far the default goes to the essence of the contract."

If the only default of the complainants had been their failure and refusal for a time to credit the defendants with the fifteen *per cent.* of the first renewal premiums in cases where the complainants had to pay commissions or a *per cent.* to solicitors of insurance who had formerly acted for the defendants, it would not have been, perhaps, under the facts of this case, such a failure to perform on the part of the complainants as would have justified a court of equity in refusing to enjoin the defendants from establishing a fire insurance agency in violation of their agreement. But this was by no means all of their default in keeping and performing the contract. It was clearly their duty under the agreement to make reasonable efforts to renew the policies of insurance which had been issued through the agency of the defendants by the line of insurance companies which the latter did or had represented at the time the agreement was entered into. It was of the greatest importance to the defendants that the complainants should in good faith exercise reasonable diligence in the performance of that duty, since the only consideration which the defendants were to receive for the transfer of their business as insurance agents, the books and records and good will pertaining thereto and

their office furniture and fixtures was the fifteen *per cent.* of the first renewal premiums on such policies. The preponderance of evidence shows that the complainants were unwilling to incur the usual and customary labor and expense incident to the renewal of such policies; that they refused to pay the commissions to which certain solicitors of insurance, who were sub-agents of the defendants at the time the agreement was entered into, were entitled in having policies renewed in companies represented by the defendants; and that this refusal resulted in such policies being renewed in other companies and the loss of the fifteen *per cent.* of such renewal premiums by the defendants.

The complainants, having failed to keep and perform their contract in this respect, which went to the essence of the agreement, are not entitled to have a direct decree for specific performance nor to a decree restraining the defendants from violating the agreement on their part, but the parties should be left to their remedies at law.

We are of opinion, therefore, to reverse the decree appealed from, and enter such decree as the circuit court ought to have entered, dismissing the bill with costs and without prejudice.

*Reversed.*